## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                 No. CR 11-2277 JB

ISAAC ULIBARRI,

       Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum, filed May 13, 2012 (Doc. 45)("Sentencing Memorandum"). The Court held a sentencing hearing on May 21, 2012. The primary issues are: whether the Court should accept the United States' Probation Office's ("USPO") calculation that Defendant Isaac Ulibarri's base offense level is 26 under U.S.S.G. § 2D1.1(c)(7), in the Presentence Investigation Report, disclosed April 20, 2012 ("PSR"); (ii) whether the Court should depart downward 2 levels from Defendant Isaac Ulibarri's base offense level, pursuant to U.S.S.G. § 2D1.1(b)(16), because Ulibarri's meets the criteria set forth in U.S.S.G. § 5C1.2(1)-(5); (iii) whether the Court should depart 3levels downward for Ulibarri's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1; and (iv) whether the Court should vary downward from the advisory guidelines in sentencing Ulibarri. For the reasons stated on the record at the hearing, and for the reasons further stated herein, the Court will: not accept the USPO's calculation of Ulibarri's base offense level; (ii) depart downward 2 levels in Ulibarri's base offense level, pursuant to U.S.S.G. § 2D1.1(b)(16); (iii) depart downward 3 levels for Ulibarri's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1; and (iv) vary downward from the adivsory guidelines and impose a sentence of 37 months.

**FACTUAL BACKGROUND**

Ulibarri has been addicted to heroin since the age of twenty-seven, and his torrid relationship with that illicit substance is the cause of the sentence which the Court imposes today.  See PSR ¶ 63, at 15.  Ulibarri was born and grew up in Espanola, New Mexico, where his family resides today. See id. ¶¶ 47, 51, at 12-13.  Ulibarri has three brothers and two sisters, and both his parents are still living.  See id. ¶¶ 48, 50, at 12-13.  He reports that his family was "close" growing up, and that his childhood was free of major struggles or any exposures to drug or alcohol abuse.  PSR ¶ 50, at 12-13.  Ulibarri is still close with his mother, with whom he speaks three or four times a month.  See id. ¶ 52, at 13.  Ulibarri's mother was diagnosed with lymphoma in 2006; she resides in Alcalde, New Mexico.  See id. ¶ 47, at 12.  Ulibarri's mother misses him and is concerned about a long incarceration, as she faces the possibility of additional cancer treatment.  See id. ¶ 52, at 13.

Ulibarri has a seemingly stable family life in Espanola.  He has a long-term relationship with his live-in girlfriend, Melissa Alcala, the mother of his children; Ulibarri has been with Alcala since he was fourteen.  See id. ¶ 53, at 13.  Ulibarri has four children with Alcala, the youngest of which is twelve and the oldest is twenty-one.  See id. ¶ 54, at 13.  All of the couple's children live at home, where they subside off of food stamps and Alcala's income from working at Wal-Mart.  See id. ¶ 55, at 13.

Ulibarri began drinking in 1995 at the age of twenty-two.  See id. ¶ 60, at 14-15.  At the age of twenty-four, he had his first altercation with the law, a driving while intoxicated conviction for which he was sentenced to, and served, forty-eight hours of community service.  See id. ¶ 42, at 10-11.  Unfortunately, that was not the end of his substance abuse.  He smoked marijuana from the age of eighteen to twenty seven, and experimented with cocaine three to four times between the ages of twenty-three and twenty-five.  See id. ¶¶ 61-62, at 15.  Ulibarri's "drug of choice is heroin." Id. ¶

63, at 15.  He began injecting heroin at the age of twenty-seven and has used heroin daily for the past eleven years.  At the height of his addiction, he has injected up to five times per day, spending between $300.00 and $400.00 per week on heroin.  He reports that he has never overdosed, but believes that he needs treatment for his addiction.  See PSR ¶ 63, at 15.  He admits that heroin has "caused him the most problems."  PSR ¶ 63, at 15.  Additionally, Ulibarri suffered from general depression in the past, but is not currently seeing a psychiatrist or receiving other psychiatric treatment.  See id. ¶ 59, at 14.  Apart from his addiction to heroin, Ulibarri has recurring back pain from an injury in 1995.  Ulibarri is otherwise in good health.  See id. ¶ 58, at 14.

Ulibarri is not highly educated and has not always been employed.  Ulibarri dropped out of school after completing the sixth grade, and has acquired on-the-job skills in landscaping, small engine mechanics, lumber jack work, welding, farming, and construction.  He has no professional licenses.  He is fluent in both English and Spanish.  See id. ¶ 64, at 15.  His previous employment, in Santa Fe, New Mexico, included working with a landscaping company, from 2006 to 2009, as a construction laborer, from 2005 to 2006, as a cable layer from 1995 to 1997, and, in Monte Vista, Colorado, as a mechanic from 1992 to 1994.  See id. ¶¶ 65-67, 69-70, at 15-16.  He has worked sporadic automobile mechanic jobs, beginning in 1997 and up through 2011, in Medanales, New Mexico.  See id. ¶ 68, at 16.  At the time he committed this federal offense he had not had regular work since 2009, and was receiving unemployment benefits of $156.00 per week.  See id. ¶ 65, at 15.

Ulibarri's financial state is not good.  He was referred to a collection agency for a delinquent solid waste bill and two delinquent cellular telephone accounts.  According to Alcala, the couple owes $42,000.00 on their mobile home and land in Medanales.  See id. ¶ 72, at 16.  His net worth is $8,304.00.  See id. at 18.  The family's expenses currently exceed their income, brought in

through Alcala and their eldest daughter's employment, and food stamps,  by about  $679.00 per month.  See PSR at 18-19.

Ulibarri's federal offense began when an undercover New Mexico State Police ("NMSP") agent contacted a confidential informant ("CI") on June 24, 2011.  The NMSP agent told the CI that the agent wished to purchase $200.00 worth of heroin.  The CI arranged for Isaac Ulibarri to deliver the heroin to a pre-determined location in Espanola, and the CI was provided with $200.00 in contingency funds for the purchase of the heroin.  See id. ¶ 8, at 4.  The CI told the NMSP agent that Ulibarri would drive a white four-door pick-up truck with tinted windows to the pre-determined location.  The NMSP agent later observed such a truck leave the pre-determined location; two NMSP officers thereafter conducted surveillance on the white truck.  A male driver and a female passenger were observed inside the truck during the surveillance.  The NMSP agents verified, through the truck's license plate, that the truck belonged to Ulibarri.  See id. ¶ 9, at 4.

The CI later gave the NMSP agent the suspected heroin, which had been purchased with the contingency funds.  The CI stated that Ulibarri sold the CI the heroin through the CI's unnamed cousin.  The CI provided Ulibarri's telephone number as the number from which the heroin provider contacted the CI's cousin.  See id. ¶ 10, at 5.

The NMSP officers continued to observe Ulibarri's actions in the white truck.  The truck was seen arriving at Private Drive 1611A, house number 16, in Medanales, the residence where records indicate Ulibarri lived.  See id. ¶ 11, at 5.  The NMSP officers later, on August 9, 2011, observed Ulibarri's white truck heading southbound from Espanola to Albuquerque, New Mexico.  The truck was observed parked at a home improvement store in northeast Albuquerque.  See id. ¶ 13, at 5. Ulibarri and Alcala exited the truck, and entered the home improvement store.  A blue truck then parked near Ulibarri's white truck.  When Ulibarri and Alcala exited the store, Alcala entered the

white truck, but Ulibarri entered the blue truck for a brief period.  Ulibarri then exited the blue truck, entered his own white truck, and began driving northbound on Interstate Highway 25.  Other NMSP agents attempted to follow the blue truck, but it was lost in traffic.  Meanwhile, NMSP agents stopped Ulibarri's truck near Cochiti Pueblo, New Mexico.  Ulibarri and Alcala complied with the agents' orders to exit the truck.  The agents told Ulibarri that they were with the Narcotics Task Force and informed him that there were cameras at the home improvement store in Albuquerque.  A NMSP agent told Ulibarri to hand over the "stuff," meaning narcotics.  See PSR ¶ 15, at 5-6.  Ulibarri complied with the agent's demand to hand over the narcotics.  Ulibarri immediately returned to his car and removed five plastic bags containing a brown powdery substance, which was later determined to be heroin.  At this point, Ulibarri was arrested.  See id. ¶ 16, at 6.

Separate police vehicles transported Ulibarri and Alcala to the Drug Enforcement Agency ("DEA") office in Albuquerque for questioning.  See id. ¶ 17, at 6.  At the DEA office, Ulibarri explained how he acquired the heroin he had in his car.  Ulibarri said he had received a telephone call from an individual known to him as "Chapo" on August 9, 2011.  Chapo reportedly offered to front Ulibarri ten ounces of heroin, meaning Chapo would give heroin to Ulibarri, and Ulibarri would pay Chapo after Ulibarri sold the heroin.  Ulibarri related that Chapo had told him to meet an unidentified male in the blue truck in Albuquerque on August 9, 2011.  See id. ¶ 19, at 6.  Ulibarri said that on August 9, 2011, Chapo called him as he was on the way to Albuquerque, told to him go to the home improvement store parking lot.  After Ulibarri and Alcala entered the home improvement store, Ulibarri said he received a telephone call from an unidentified male, who requested Ulibarri to meet in the parking lot at the blue truck.  See id. ¶ 20, at 6.  Ulibarri then stated that he left the home improvement store, as directed, and met the unidentified male in the blue truck in the parking lot.  Ulibarri said that the unidentified male gave him ten ounces of heroin.  See id.

¶ 21, at 6.  Ulibarri told the agents at the DEA office that they would find four more ounces of heroin in his truck, in addition to the heroin Ulibarri had already turned over to them.  Four ounces of heroin were later found in the cab of Ulibarri's truck behind the rear passenger's seat.  <u>See</u> PSR ¶ 22, at 7.

       Ulibarri related that Churro offered him the job of selling heroin.  <u>See id.</u> ¶ 23, at 7.  Ulibarri reported that he accepted the offer, and agreed to work with Churro and Chapo, and that he was given a cellular telephone for communicating with Churro and Chapo.  <u>See id.</u> ¶ 23, at 7.  Ulibarri related that Churro and Chapo fronted him heroin throughout the time he sold heroin with them.  <u>See id.</u> ¶ 24, at 7.  Ulibarri paid between $600.00 to $700.00 per ounce to Chapo after selling the Chapo fronted him.  Ulibarri related that he would usually meet Chapo's drug traffickers every three weeks in Albuquerque to pay for the heroin.  Ulibarri said he usually charged friends $150.00 for three grams of heroin.  <u>See id.</u> ¶ 23, at 7.  Ulibarri related that this operation of purchasing heroin from Churro and Chapo, and then selling the heroin, had gone on from January, 2011, to August 2011.  He reported that he met Chapo's drug traffickers approximately ten times, each time receiving five ounces of heroin.  Ulibarri said he met a different individual each time.  Ulibarri related that he had "met" Chapo via a cellular telephone conversation, but had never met him face-to-face.  <u>See</u> PSR ¶ 24, at 7.  The identity of Churro and Chapo remains unknown.  <u>See id.</u> ¶ 23, at 7.

       Ulibarri cooperated before, during, and after his arrest.  He provided the names of several individuals with Ulibarri claimed he associated during the trafficking scheme.  <u>See id.</u> ¶ 25, at 7.  Ulibarri had no information regarding Churro's and Chapo's identity.  Although Ulibarri said that Churro and Chapo gave him a cellular telephone, the cellular telephone found on Ulibarri and which was used in the initial heroin purchase on June 24, 2011, was registered to Ulibarri.  <u>See</u> PSR ¶ 26,

at 7.  DEA laboratory reports indicate that Ulibarri was in possession of 251 net grams of heroin

when he was arrested on August 9, 2011.  See id. ¶ 25, at 7.  The street value of that amount of

heroin is approximately $6,000.00 to $7,000.00.  See id. ¶ 26, at 8.  The USPO estimates that

between January, 2011, and August, 2011, the total amount of heroin Ulibarri received  was 1,671

grams.  See id. ¶ 27, at 8.

## PROCEDURAL BACKGROUND

Ulibarri, pursuant to a Plea Agreement, filed February 24, 2012 (Doc. 40), pled guilty to the

Indictment, filed August 23, 2011 (Doc. 11), charging him with violations of 21 U.S.C. §§ 841(a)(1)

and (b)(1)(B) -- Possession with Intent to Distribute 100 Grams and More of Heroin.  See Plea

Agreement ¶ 3, at 2.  The parties stipulate that "[a]t least 100 grams but less than 400 grams of

heroin is attributable to the Defendant" and "agree that the Defendant's base offense level under the

sentencing guidelines is 26, pursuant to U.S.S.G. § 2D1.1(c)(7)."  Plea Agreement ¶ 9(a), at 5.  The

parties stipulate that Ulibarri "was not a minor or minimal participant in the criminal activity

underlying this agreement, as that term is defined in U.S.S.G. § 3B1.2."  Plea Agreement ¶ 9(b), at

6.  The parties further stipulate that Ulibarri "has clearly demonstrated a recognition and affirmative

acceptance of personal responsibility," and is "entitled to a reduction of three levels from the base

offense level as calculated under the sentencing guidelines" "pursuant to U.S.S.G. § 3E1.1."  Plea

Agreement ¶ 99(c), at 6.  The parties stipulate that Ulibarri "agrees that a sentence within the

applicable guidelines range is a reasonable sentence," and "not to seek a downward departure or

variance from the applicable sentencing guidelines range as determined by the Court."   Plea

Agreement ¶ 9(d), at 6-7.  Ulibarri waives his right to appeal his conviction under 28 U.S.C. § 1921

and 18 U.S.C. § 3742, and Ulibarri waives his right to a collateral attack of his conviction pursuant

to 28 U.S.C. § 2255, except on the issue of his counsel's ineffective assistance in negotiating or

entering the plea.  See Plea Agreement ¶ 12, at 9.  The United States agreed to not bring any additional criminal charges against Ulibarri arising from the facts forming the basis of his Indictment.  See Plea Agreement ¶ 13, at 9-10.

The USPO disclosed a PSR for Ulibarri on April 20, 2012.  See PSR at 2.  The USPO applies a base level of 26 pursuant to U.S.S.G. § 2D1.1(c)(7) for the offense incoming more than 100 but less than 400 grams of heroin, as Ulibarri had 251 net grams of heroin on him at the time of the arrest.  The USPO relates that Ulibarri received approximately 142 grams of heroin on each of ten separate occasions between January and August of 2011.  According to the USPO, the total amount of heroin attributable to Ulibarri is 1,671 grams, which would make his base offense level 32, were that heroin considered.  In light of the parties' stipulation as to Ulibarri's offense, and the amount of heroin found on Ulibarri being less than that which may be attributed to him, the USPO applied a base offense level of 26.  See id. ¶ 33, at 9.  The PSR includes a reduction of 2 levels pursuant to U.S.S.G. § 2D1.1(b)(16) for Ulibarri having met the criteria set forth in U.S.S.G. § 5C1.2(1)-(5), because Ulibarri provided "all information and evidence he has concerning the offense."  PSR ¶ 34, at 9.  The PSR also includes a 3 level reduction under U.S.S.G. § 3E1.1 for Ulibarri's acceptance of responsibility for the offense.  See id. ¶ 39, at 10.  The USPO, thus, calculates Ulibarri's total total offense level to be 21.  See id. ¶ 40, at 10.

The PSR lists Ulibarri's criminal history category as I.  The PSR reflects two prior convictions in Ulibarri's past.  The first conviction is for misdemeanor offenses on three counts, all related to a Driving While Intoxicated Offense.  Ulibarri was convicted, on January 26, 1998, of: Failure to Maintain Traffic Lane; (ii) Consume or Possess Open Container of an Alcoholic Beverage; and (iii) Driving While Intoxicated-First Offense.  This conviction, being for misdemeanor offenses, gave Ulibarri no criminal history points.  See PSR ¶ 42, at 10-11.  The

second conviction in Ulibarri's criminal history is for Extreme Cruelty to Animals, a felony offense. Ulibarri was sentenced to 18 months of probation for having "intentionally or maliciously killed a Grey Stud Horse," by having  "failed to provide necessary sustenance to an animal under his control."  PSR ¶ 43, at 11.  Ulibarri pled guilty to the offense and was required to provide proper care for all of his animals as part of his probation.  Ulibarri received 1 criminal history point for this conviction.  See id. ¶ 43, at 11.  With 1 criminal history point, Ulibarri's criminal history category is I.  See id. ¶ 44, at 11.

On May 13, 2012, Ulibarri filed his Sentencing Memorandum.  See Doc. 45.  Ulibarri requests the Court to sentence him at the "lower end of the [g]uidelines range (37 months imprisonment)."  Sentencing Memorandum at 1.  Ulibarri points to his "consistent involvement in his children's lives" and "enduring dedication to his family" as justification for such a sentence. Sentencing Memorandum at 1-2.  Ulibarri asserts that, despite his limited education, he encourages his children to "finish school, work hard, and take care of themselves and their family."  Sentencing Memorandum at 2.  Ulibarri characterizes his compliance with the NMSP agents as a "cry for help to overcome his drug addiction."  Sentencing Memorandum at 3.  Ulibarri asserts that, unlike many drug addicts, he has avoided crimes against people or property.  See Sentencing Memorandum at 3.  Ulibarri requests an individualized drug addiction program, specifically the federal prison systems' Residential Drug Abuse Treatment Program, so that he can successfully treat his addiction to heroin.  See Sentencing Memorandum at 4, 7.  He implores the Court to grant him a "minimal term of imprisonment followed by an extended period of supervised release that includes effective individualized drug treatment and follow up management," so that he may fully recover from his addiction and return to his children still living at home.  Sentencing Memorandum at 7.  Ulibarri's two daughters and two sisters, as well as Ulibarri, wrote letters to the Court that request a sentence

at the low end of the guidelines.  See Sentencing Memorandum, Ex. A.

The Court held a sentencing hearing on May 21, 2012.  See Transcript of Hearing, May 21, 2012 ("Tr.").[1]  The Court was concerned about an inconsistency between the Plea Agreement and the PSR.  The Court noted that, on page four, paragraph five, the language states that "the defendant knowingly waives the right to appeal . . . any sentence and fine within or below the applicable advisory guidelines range as determined by the Court."  See Tr. at 2:16-18 (Court); PSR ¶ 5(d), at 4.  The Court pointed out that the language of the Plea Agreement indicates that Ulibarri waived his right to appeal any conviction "at or below the maximum statutory penalty," and the Court suggested that such a change be made.  Tr. at 2:21-15 (Court).  The parties agreed to the change.  See Tr. at 3:1-5 (Probation Officer, Court, Rein, Sullivan).

The United States moved the Court to sentence Ulibarri to a 40 month term in light of his admittance to having trafficked between $6,000.00 and $7,000.00 worth of heroin.  Tr. at 17:5-19 (Sullivan).  The United States pointed to Ulibarri having brought heroin into Espanola, a "community that is plagued by heroin addiction, [where] people really struggle as result of this toxic and dangerous substance" as justification for the proposed 40 month sentence.  Tr. at 16:6-12 (Sullivan).  The United States also pointed to Ulibarri's prior conviction for "intentionally and maliciously causing the death" of a horse as evidence that Ulibarri should be sentenced to 40 months.  Tr. at 16:24-17:4 (Sullivan).

## ANALYSIS

The Court adopts the factual findings in the PSR as its own, except with respect to the language in paragraph five, on page four, and the base offense level.  The Court adopts the following

---

[1]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

language for paragraph five of the PSR:"defendant knowingly waives the right to appeal the defendant's conviction and any sentence and fine at or below the maximum statutory penalty."  The Court finds that this language accurately reflects what the parties agreed in their Plea Agreement. See Plea Agreement ¶ 12, at 9.

Additionally, the Court finds that Ulibarri's base offense level should be 32, not 26, as indicated in the PSR.  In determining Ulibarri's base offense level, the Court factors in the total amount of heroin that is attributable to Ulibarri during his admitted drug trafficking from January, 2011 to August, 2011 -- 1,671 grams, in addition to the 251 net grams of heroin found on Ulibarri when arrested.  See PSR ¶ 33, at 9.  The Court accepts the USPO's recommendation for a reduction of 2 levels, pursuant to U.S.S.G. § 2D1.1(b)(16), as Ulibarri meets the criteria set forth in U.S.S.G. § 5C1.2(a)(1)-(5).  See PSR ¶ 34, at 9.  The Court further accepts the USPO's recommendation that Ulibarri receive a reduction of 3 levels, pursuant to U.S.S.G. § 3E1.1, for having demonstrated an acceptance of responsibility for the federal offense.  See PSR ¶ 39, at 10.  Thus, the Court finds that Ulibarri's total offense level is 27.  The Court accepts the USPO's calculation that Ulibarri's criminal history category is I, with Ulibarri having one prior felony conviction on his record.  See id. ¶ 43-44, at 11.  Although Ulibarri's conviction for the extreme mistreatment, resulting in death, of a horse, is troubling, the Court is nonetheless comfortable with his criminal history category being I, especially in light of Ulibarri's positive characteristics, discussed below.  With an offense level of 27 and a criminal history category of I, the guidelines sentencing range for Ulibarri is 70 to 87 months.

The Court has considered the factors set forth in 18 U.S.C. § 3553(a)(1)-(7) in arriving at Ulibarri's sentence.  The Court has carefully weighed the guidelines, as well as other sentencing goals, in determining an appropriate sentence for Ulibarri.  The Court believes that the guidelines

range of 70 to 87 months is not appropriate for Ulibarri's offense.  The Court has found that a number of factors counsel in favor of a variance:  Ulibarri's cooperation with the NMSP agents and his confession; (ii) his stable family life and long-term relationship with his partner; (iii) his eagerness to receive treatment for his heroin addiction; and (iv) the relatively small amount of heroin which was found on him when arrested.   In light of these factors, the Court believes that a sentence closer to the range of 37 to 46 months, which a total offense level of 21 would produce, is appropriate.

The Court believes that a sentence of 37 months is sufficient without being greater than necessary to comply with the purposes of punishment set forth in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.). The Court finds that such a sentence accurately reflects the seriousness of Ulibarri's offense and will promote respect for the law in Ulibarri's home community of Espanola.  While this sentence reflects a substantial variance from the sentencing guidelines range, this 37 month sentence is longer than he has ever received, and is very long by state standards for drug trafficking crimes.  Moreover, it is not an insufficient sentence by any standard.  A sentence of 37 months will serve deterrence at a specific level and within the Ulibarri's community, as well as in the general United States population.  While this sentence reflects a substantial variance from the 70 month sentence which accompanies a total offense level of 27, a sentence of 37 months avoids unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct; there are several sound reasons to vary.  The Court will sentence Ulibarri to three years of supervised release after his 37 month term, and impose conditions that will provide education, training, care to help Ulibarri to overcome his drug problem, and to stay on the straight and narrow with the law.  The Court finds that a sentence of 37 months, combined with a term of supervised

release designed to aid Ulibarri in acquiring education and battling his addiction, accurately reflects the factors Congress has outlined in 18 U.S.C. § 3553(a) and better reflects them than would a guidelines sentence.  Also, while slightly less than the United States' proposed sentence of 40 months when the Court agreed to a total offense level of 27, that Ulibarri was willing to help the government supports a sentence of 37 months.

The Court thus commits Ulibarri to the Bureau of Prisons for a term of 37 months.  The Court recommends the Bureau of Prisons allow Ulibarri to participate in the Bureau of Prisons 500 hour drug and alcohol treatment program.  Ulibarri will be on supervised release for a term of three years.

**IT IS ORDERED** that Defendant Issac Ulibarri's request to sentence at the low end of the guidelines in Defendant's Sentencing Memorandum, filed May 13, 2012, is granted in part and denied in part.  The Court denies the parties' request that the Court find Ulibarri's total offense level to be 21, but will vary from the applicable guidelines range and will sentence Ulibarri to a sentence equivalent to the guidelines range to which the parties agreed upon. The Court sentences Ulibarri to 37 months imprisonment, followed by three years of supervised release.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales                              Jeff Rein
  United States Attorney                          Albuquerque, New Mexico
Sean Sullivan
  Assistant United States Attorneys                    Attorney for the Defendant
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

-13-